THOMAS O. MEAD et al., Appellants, v. LILLIE M. ROBERTSON et al., Respondents.

Kansas City Court of Appeals, May 25, 1908.

1. **TRUSTS AND TRUSTEES: Promise: Wills: Fraud: Equity.** In order to make a legatee a trustee for another when not so expressed in the will, there must have been an intention of the testator to that effect and a promise by the legatee to carry out such intention, the principle being that the legacy would not have been given or the intestacy allowed to ensue unless the promise had been made, and the failure to perform it would be a fraud calling for the remedial hand of equity.

2. ————: ————: ————: ————: **Intention.** Such promise should be made to the testator· or intestate and be the cause of the not making necessary legal provision to effectuate the intention; and a mere intention, however clearly expressed, to make a will with certain provisions will not prevent the estate from descending in the ordinary course, if by neglect or other mishap the will is not made.

3. ————: ————: ————: ————: **Evidence.** In such case mere silent acquiescence may have all the force and effect of an express promise, but the evidence to establish such trust must be so persuasive, cogent and certain from end to end of every essential element as to leave no room for reasonable doubt.

4. ————: ————: ————: ————: ————. The evidence relating to alleged disposition by an intestate of his property in favor of plaintiffs and the acts of the defendant at the time of such disposition by the intestate, is reviewed and held insufficient to make the defendants trustees for the plaintiffs as to certain property descending to them, because:

   1. It is too uncertain and indefinite.

   2. It fails to show a promise by the sole heir of the intestate.

   3. The claim that the husband of the heir assented for her is wholly insufficient, since he had no power to encumber her expectancy.

   4. The intestate did not know that the heir was hearing to his deposition of the property.

   5. The intestate did not know of his inability to dispose of his property as he attempted to without the heirs' consent.

   6. The heir did not know of the right to object or decline to assent to the disposition.

Appeal from Saline Circuit Court.—*Hon. Samuel C. Davis,* Judge.

AFFIRMED.

*Duggins & Rainey* and *W. M. Williams* for appellants.

(1) If a testator "is induced either to make a will or not to change one after it is made, by a promise, express or implied on the part of a legatee that he will devote his legacy to a certain lawful purpose a secret trust is created and equity will compel him to apply property thus obtained in accordance with his promise." "The trust springs from the intention of the testator and the promise of the legatee." "The same rule applies to heirs and next of kin who induce their ancestor, or relative, not to make a will by promising in case of intestacy to dispose of the property or a part of it in the manner indicated by him. The rule is founded on the principle that the legacy would not have been given, or intestacy allowed to ensue, unless the promise had been made; and hence the person promising is bound, in equity, to keep it, as to violate it would be fraud." Trustees of Amherst College v. Ritch, 152 N. Y. 282, 37 L. R. A. 321; Williams v. Fitch, 18 N. Y. 546; Parker v. Urey, 21 Pa. 305; Hooker v. Livingston, 33 Mich. 453; Bennett v. Harper (W. Va.), 15 S. E. 143; O'Harra's Will, 95 N. Y. 403; Ahrens v. Jones (N. Y.), 62 N. E. 667; Owens' Case (Md.), 17 Am. Dec. 338; Grant v. Bradstreet (Me.), 33 Atl. 165; Brooke v. Chappel, 34 Wis. 405; 1 Underhill on Wills, sec. 153; Thornton on Gifts and Advancements, sec. 437; 1 Beach on Modern Equity Jurisprudence, sec. 230; 2 Pomeroy's Eq. Jurisprudence (2 Ed.), sec. 754. (2) The enforcement of such trusts does not interfere with or modify the will of the testator, or the statute of descents and distributions in the case of intestacy. The title to the property, in the one case, is vested in the legatee in accordance with the will, and, in the other, in the heir at law, as provided by the statute. The party

after receiving the property is required to hold it in trust for the uses and purposes intended by the decedent. It is not enforced as an express trust created by the deceased, but arises out of the act of the legatee or heir at law in securing a benefit to himself, under a promise to dispose of the property in a certain way, and then, refusing to carry out his agreement. With the holder for his fraud, and out of the facts raised a trust *ex maleficio,* instead of resting upon one as created by the testator himself. 1 Underhill on Wills, sec. 153, p. 219; Williams v. Fitch, 18 N. Y. 546; Trustees of Amherst College v. Ritch, 152 N. Y. 282, 37 L. R. A. 321; Brooke v. Chappel, 34 Wis. 405. (3) An express and formal contract between the deceased and the heir at law need not be shown, nor is it necessary to prove the decedent said he would make a will unless the heir would agree to dispose of the property in accordance with his directions. Neither is it essential to show by direct evidence that the deceased was prevented from making a will by the promise of the heir. This, like any other fact, may be deduced from the circumstances surrounding the parties, their actions, words and conduct. It is sufficient "if the decedent relied upon the promise of the heirs or devisee as an effective arrangement for the future disposition of his property. Whitehouse v. Bolster (Me.), 50 Atl. 240; Grant v. Bradstreet (Me.), 33 Atl. 165; Brooke v. Chappel, 34 Wis. 407. (4) There is evidence in this case of an express and direct promise to the deceased by the heir at law, as well as by her husband, to use the property for the purpose of carrying out his wishes and completing the gifts which he desired to make. However, "trusts of this nature may be created by silent assent, as well as by express words." "While a promise is essential, it need not be expressly made, for active co-operation or silent acquiescence may have the same effect as an express promise." Trustees of Am-

herst College v. Ritch, 37 L. R. A. 321; Brooke v. Chappel, 34 Wis. 414; 1 Beach on Modern Equity Jurisprudence, sec. 230, p. 260; Curdy v. Burton (Cal.), 21 Pac. 858; O'Hara's Will, 95 N. Y. 412; Schultz' Appeal, 80 Pa. St. 405; Gilpatrick v. Gliddon, 2 L. R. A., and note on page 662.   (5)  The money, notes and bonds belonging to William J. C. Mead, deceased, were turned over to defendant, Lillie M. Robertson.  Five or six thousand dollars of these funds have been invested in the name of, and are now held by the defendant, J. A. Robertson, her husband.  This trust fund may be followed into the hands of any person taking the same with notice.  The petition asks that an account be taken of the money received by the defendants from the estate of William J. C. Mead, and that the rights of the parties in said trust funds be determined by the court and enforced by its decree.  A court of equity will mould its decree to suit the facts and circumstances in the particular case.  The defendants may be adjudged to pay to the plaintiff and a trustee for the defendant, Nannie Q. Mead, out of the money received by them from said estate the sums to which they are respectively entitled.  Snorgrass v. Moore, 30 Mo. App. 232; Baier v. Berberich, 64 Mo. App. 537; Synod v. Showich, 143 Mo. 664.

*T. H. Harvey* and *Frank P. Sebree* for respondents.

(1)  The plaintiffs failed to make a case even under the law as asserted by them, and the judgment of the lower court was right.  Pitts v. Weakley, 155 Mo. 109; Mulock v. Mulock, 156 Mo. 431; Whitehouse v. Bolster, 95 Mo. 458; Grant v. Bradstreet, 33 Atl. (Me.) 165; Rosenwald v. Middlebrook, 188 Mo. 58; Russell v. Sharp, 192 Mo. 270; Kirk v. Middlebrook, 201 Mo. 289.   (2)  No agreement by Dr. Robertson could fasten a trust on the property of his wife, the defendant, Lillie M. Robertson.  R. S. 1899, sec. 4340; Jones v. Elkins,

143 Mo. 647; Grocery Co. v. Ballinger, 137 Mo. 369. (3) The evidence fails to show that Mrs. Robertson made any promise concerning the property, but had she done so no trust would have been created thereby. R. S. 1899, secs. 3416, 4604, 4626; 3 Pom. Eq. Jur. (3 Ed.), sec. 1054, 1056; Bedilion v. Seaton, 3 Wall., Jr., 280, 3 Fed. 38; Cassels v. Finn, 122 Ga. 33, 106 Am. St. 91 and notes.

ELLISON, J.—This is a bill in equity to declare defendants trustees *ex maleficio* and enforce an implied or constructive trust. The judgment in the trial court was for the defendants.

The case arises out of the following facts: William Mead was a young unmarried man about twenty-four years of age. His father and mother were dead and his only heir was his half sister, Lillie M. Robertson, who was the wife of Dr. J. A. Robertson, called Arch by some witnesses. William died in May, 1904, after a week or ten days' illness, leaving a personal estate of about ten thousand dollars. About nine o'clock of the evening preceding the day of his death there were in the room with him Dr. Robertson, his brother-in-law, Dr. Reid, his physician, Rev. Alton, the pastor of his church, Henry Mead, his uncle and former guardian, and his aunt, Mrs. Charles Mead. His sister was in an adjoining room, but in hearing. He was informed by his physician that he could not recover and was asked if there was any business he desired attended to. His uncle and former guardian stated what transpired in the following way: "I asked Willie Mead if there was anything in regard to his business he wanted attended to; he turned to me and asked me how much money he had; I told him he had $10,000, or thereabout, or more; I do not remember my words, and he then started up and said, 'I want to give Uncle Olan the note he owes me; I want to give Uncle Charlie's

girls $400 each; I want to give Sam $1,000; I want half of my remaining estate held for the benefit of Cousin Nannie, who was his step-mother, in case she needed it; in case she did not to give it to his sister, Mrs. Robertson, and the remaining half to be given his sister. He then turned to Dr. Robertson and said: 'Are you satisfied with this?' He said: 'Yes, whatever you want done with it, we will do,' or words to that effect; he soon after that says, turning to Dr. Robertson: 'I want you and Uncle Henry to attend to this matter for me,' and Arch (Dr. J. A. Robertson) says, 'All right;' I did not say anything; Willie turned to me and said: 'Do you hear me?' I said: 'Yes, I hear you and we will attend to it;' I think that was pretty nearly everything that occurred; there may be something I have not remembered exactly."

Later in the night his sister came out into his room. She testified: "Well, Thursday night I went to his bed myself, and he took me by both hands, as I said before, and said, 'I am almost gone, Lillie; I can not last long.' And he pressed both of my hands and I bent with my ear down to his mouth and he whispered, 'With a little distribution, I have left the rest for you.' "

After the death of William, Dr. Robertson and Henry Mead were appointed administrators of his estate. Final settlement was made and ten thousand dollars paid over to Lillie M. Robertson as sole heir. A part of this was invested by Dr. Robertson and he is made a party defendant with his wife. They refused to comply with the request of William and this bill was brought to enforce a trust, as already stated. The importance of the question here presented is heightened by the fact that it seems not to have arisen heretofore in our courts. Industry of counsel, however, has brought to our aid many adjudications from other

States and countries and we are thus not left without help in its solution.

It may be stated at the outset that fraud is the foundation of an action of this nature, and that the object of such an action is to arrest the consummation of a fraud. But for the element of fraud, equity would be without excuse for interposing against the statute of wills and the statute of frauds, which require certain solemn written formalities for wills and certain writings (where lands are involved) for trusts. [R. S. 1899, secs. 3416, 4604.] Therefore, since a wilfully broken promise, made in aid of the promisee's definite intention, which thwarts such intention and prevents other action, is a fraud, equity affords relief to the beneficiaries of the promise. There must not only be an expressed intention, but there must be a promise made to carry out such intention; otherwise there would be no breach of promise and consequently no fraud by the promisor. As said in Trustees of Amherst College v. Ritch, infra, "The legatee, if he has made no promise and none has been made in his behalf, takes an absolute title and can do what he pleases with the gift. Whatever moral obligation there may be, no legal obligation rests upon him." In recognition of this, the principle of equity may be stated to be, that if a testator "is induced either to make a will or not to change one after it is made, by a promise, express or implied, on the part of a legatee that he will devote his legacy to a certain lawful purpose, a secret trust is created and equity will compel him to apply property thus obtained in accordance with his promise. The trust springs from the intention of the testator and the promise of the legatee.

"The same rule applies to heirs and next of kin who induce their ancestor, or relative not to make a will by promising, in case his property fall to them through intestacy, to dispose of it, or a part of it, in

the manner indicated by him. The rule is founded on the principle that the legacy would not have been given, or intestacy allowed to ensue, unless the promise had been made; and hence the person promising is bound, in equity, to keep it, as to violate it would be fraud." [Trustees of Amherst College v. Ritch, 152 N. Y. 282, 45 N. E. 876; O'Hara's Will, 95 N. Y. 403; Williams v. Fitch, 18 N. Y. 546; Ahrens v. Jones, 169 N. Y. 555, 62 N. E. 666; Ransdel v. Moore, 153 Ind. 393; Hooker v. Livingston, 33 Mich. 453; Smullin v. Wharton, 103 N. W. 288; Grant v. Bradstreet, 87 Me. 583; Gilpatrick v. Glidden, 81 Me. 137; Whitehouse v. Bolster, 95 Me. 458; Brooke v. Chappell, 34 Wis. 405; 1 Underhill on Wills, sec. 153; Thornton on Gifts and Advancements, sec. 437; 1 Beach, Modern Eq. Jur., sec. 754.]

Of the foregoing cases, Hooker v. Livingston was where a wife, wishing her property to go to her husband in such way as not to be taken for his debts, was advised by her attorney to devise to him and another, absolutely, on an oral understanding that they would hold for the husband's use. She did so. After her death the attorney was willing to carry out her intention, but the other refused. The trust was enforced. That of O'Hara's Will, was where the testatrix left her estate jointly and absolutely "to her lawyer, her doctor and her priest," in reliance upon their honor to carry out her declared intentions, among which were certain charitable purposes. The gifts to the charitable institutions being contrary to the statute of New York, and failing, in that respect, on that account, a trust was declared and enforced for her heirs and next of kin. In Gilpatrick v. Glidden, the testator was induced by his wife to will his property to her on the faith of her promise to use it during her life and to transfer all that remained to his heirs. Her failure to transfer was held to be a fraud on the testator and the heirs, and the

trust was enforced, notwithstanding the statute of frauds. In that case there is an interesting collection of English cases which, in a variety of forms, disclose the same rule. Thus, "If a father devises to his youngest son, who promises that, if the estate is devised to him, he will pay 10,000 £ to the eldest son, the court would compel the former to discover whether that passed in parol; and if he acknowledged it, even praying the benefit of the statute, he would be a trustee to the value of 10,000 £." [Stickland v. Aldridge, 9 Ves. Jun. 516.]

We have already stated there must be a promise made to the testator or intestate. But we now go further and say that from the nature of the action and the reason of the rule sustaining it, the promise must have been the *cause* of the testator or intestate, himself, not making the necessary legal provision to effectuate the carrying out his desire. If this were not true we would necessarily drop into the position that wills need not be written, nor express trusts witnessed by writing. The statute requires that a will shall be written and no mere misfortune or accident will avoid that requirement. Thus, though one express an intention, in the clearest terms, to make a will with certain provisions, yet, if by neglect he does not do so, his estate will descend in ordinary course. So if one, desiring to make a will, by mishap or otherwise, finds himself in such place, position or situation, at the approach of death, that he cannot do so, as if he should be where he could not get assistance if he needed it, or material upon which to write it, he will die intestate and his property descend in ordinary course. The same may be said as to a failure to change, or add to, a will already made. So, in effect, and by intendment of law, the following takes place between the promisee and the promisor; the former makes known his desire and intention and says to the latter, if you will promise me to carry out these desires after my death, I will trust

131 App.—13

Mead v. Robertson.

you, but unless you promise, I will make a will, or change the one already written, as the case may be. From these suggestions it follows that it is necessary to a case of this nature that it be made to appear that the deceased was in a position to carry out, and would have, and could have carried out, his desire and intention by the execution of the proper legal paper. Otherwise the promise has not prevented him and his failure must be laid to untoward circumstances. We feel that we are justified in these conclusions, not only from the reason of the matter, but from the facts stated in adjudicated cases. Thus in Chamberlain v. Chamberlain, Freeman's Ch. 34 (italics ours), "the father *being about* to change his will," the son made certain promises of payment if the will was not changed. In Oldham v. Litchfield, 2 Vern. 506, the testator was *"prevented* from changing annuities in his will by a promise of payment by the devisee." In Drakeford v. Wilks, 3 Atk. 539, it is said by the Lord Chancellor that, "A will being ambulatory, if the testatrix has a conversation with a legatee, and the legatee promises that, in consideration of the testatrix' disposition in favor of her, she will do and act in favor of a third person, and the testatrix lets the will stand, it is very proper the person who undertook to do the act should perform; because I must take it, if she had not so promised, *the testatrix would have altered her will."* In Boyes Case, 26 Ch. Div., 531, 535, it is said, "it was to be presumed that, if it had not been for such promise, the testator *would not have made, or would have revoked the gift."* In all the English cases, many of them collected in Gilpatrick v. Glidden, supra, there appears a present ability to make a will, or to change one already made; and it is the same with those in this country, as may be verified by an examination of above citations. Thus in Whitehouse v. Bolster, 95 Maine 458, 50 Atl. 240, it was said in argument that the rule had been modified, in some degree, in Grant v. Bradstreet, 87

Maine 583, 33 Atl. 165, but the court said not; that although in that case "the testimony made no express reference to a will, it was clearly inferable, under the particular circumstances of that case, that the decedent, then upon his death-bed, and solemnly attempting to make provision for certain persons in the event of his expected decease, relied upon the promise of the heir, *and so omitted* to make other disposition of his property. In fact the inference was almost irresistible." In Smullin v. Wharton, 103 N. W. 288, the wife was called into the room and expressly promised to carry out her husband's wishes *in consideration of which* he did not incorporate certain provisions in his will then about to be signed. In Ransdel v. Moore, 153 Ind. 393, 53 N. E. 767, the husband *dissuaded his dying wife from making a will by asking her to rely on him to carry out her wishes.* Each of the last two cases contains a valuable collection of authorities on the subject.

From the foregoing view, it may be stated, in a general way, that the law itself does not bar plaintiffs of the relief they seek, if there is the requisite proof made, and we must therefore look to the facts of the case to see if the charge of a trusteeship, *ex maleficio,* has been established. Before referring specifically to the testimony, we will first ascertain the character of evidence necessary to make out a case.

Proof of a promise on the part of the heir or devisee need not be that it was expressly made. The proof may consist in the silence of the promisor on hearing the declaration of the deceased's intentions. "Where in such case the legatee, even by silent acquiescence, encourages the testatrix to make a bequest to him to be by him applied to the benefit of others, it has all the force and effect of an express promise." [Matter of O'Hara's Will, 95 N. Y. 412; Brook v. Chappell, 34 Wis. 405, 414; Smullin v. Wharton, 103 N. W. 288; Byrn v. Godfrey, 4 Ves. June 6, 10.] Not to speak, in such circumstances, would

be encouraging and inviting the trust of the promisee. [L. R., 4 H. L. 82.]

But the evidence to establish a trust, in the face of the statute requiring wills to be in writing, must be "clear and indubitable." [Whitehouse v. Bolster, 95 Maine 458, 50 Atl. 242.] And in Grant v. Bradstreet, 87 Maine 583, the court went so far as to say, in effect, that to justify relief in equity the verbal testimony must establish the trust with as much certainty as if it had been witnessed by the legal formality of writing required by the statute. It must be admitted that if relief is to be had against the direct and affirmative terms of a statute on anything short of the clearest and most undoubted proof, the courts will, by so doing, set aside its provisions and will bring into practice again the reign of fraud and perjury the statute was meant to abolish. So the Supreme Court of this State has, time and again, repeated that for equity to interpose between the complainant and the command of the statute requiring a writing, the evidence must be of the most cogent and convincing nature; that it must be so clear, definite and positive as to leave no reasonable doubt in the mind of the chancellor. [Mulock v. Mulock, 156 Mo. 431; Pitts v. Weakley, 155 Mo. 136.] A mere preponderance of evidence will not meet the requirements of the rule; it must be so convincing as that no reasonable doubt will linger. [Russell v. Sharp, 192 Mo. 271, 285.] There must be certainty in the proof beyond reasonable doubt from "end to end." [Kirk v. Middlebrook, 201 Mo. 245, 289.] Not only so, but there must be clear and undoubted proof of *every essential element* of the contract. [Rosenwald v. Middlebrook, 188 Mo. 59, 101.]

After a careful examination of the record, we have concluded, with the learned chancellor at the trial, that the evidence in this case does not come up to the requirements of the law. It does indeed show that the deceased, on his death bed, expressed desires which he wished car-

Mead v. Robertson.

ried into effect after his death.    It shows that he was
in such condition of mental soundness and was so sit-
uated that he could have made a will.    But it does not
show, with that degree of clearness and certainty which
the law demands, that he *would* have made a will if no
promise had been made to him to carry out his expressed
wishes; nor does it show that a promise was    made.
Neither is it clearly shown what were his wishes in re-
gard to the claim here made by the four daughters of
his uncle as to what they were to receive.

Notwithstanding that about the time he stated his
desires and during the several hours intervening before
his death he was at times unconscious and was bodily
in a very weak condition, yet we have no doubt of his
having testamentary capacity; and that, considering he
was surrounded by his friends, at a place where material
(pen, ink and paper) could have been had, he could
have made a will.    But the evidence does not indicate
that he would have done so.    He gave no expression to
a desire to make a will.    He did not say anything about
any disposition of his property until the suggestion was
first made to him.    We have just as much right to as-
sume that but for that suggestion he would have died
leaving his property with the law, which would have
cast it upon the defendant, his only sister, as we have to
assume many other things which would be necessary to
make out plaintiff's case.    It is true that calling his at-
tention to matters of business, which, in his case, could
only mean a disposition of his property, should not be
allowed to prevent his fixing a trust upon his heir; but
we are now dealing with a state of evidence which in-
volves the probabilities of what might have been done.

The evidence as to what amounts of money his un-
cle Charley's four daughters were to receive out of his
estate, is uncertain on account of the uncertainty which
attaches to his expressed wish, as it has been remembered
and detailed in evidence by the witnesses for the com-

plainants. The rule is, that whenever the property to which such a trust is designed to attach, is not certain and definite, no trust attaches. "The party claiming that such a trust exists for his benefit must show that his case falls within the rules of certainty of subject matter as well as establish an intention to charge the property. A trust must be reasonably certain in its terms, as to the property embraced in the trust;" and when "this element is indefinite and uncertain the trust must fail. [Pomeroy's Eq. Jur., sec. 1009;" Smullin v. Wharton, 103 N. W. 289; Bryan v. Milby, 6 Del. Ch. 208, 24 Atl. 333; Winch v. Button, 14 Sim. 379; Fox v. Fox, 27 Beav. 301; Bowman v. Harrison, 10 Hare 234.] Two witnesses (his uncle and the mother of the girls), state that he said he wanted to give the four girls $400 *each*. That is plain enough. But two others (the doctor and pastor), did not so express it. The doctor said that he wanted to give his uncle Olan his note, "and the girls of his uncle Charlie's $400." The pastor said "I remember that he wanted $400 to go to the daughters of Charlie Mead." There were four daughters of Charles Mead. Who can say, from this evidence of the four witnesses, whether each of the daughters was to get $400, or that each of them was to get $100? The statements of the two former witnesses mean, of course, that the four girls were each to get $400. But the statements of the two latter witnesses do not convey that meaning. The latter statements would only give $400 between them, or $100 each, when divided.

We have already seen that in order to make out a case plaintiffs must establish a promise made by the defendant, who was his sister and heir. His uncle and aunt, his physician and pastor, together with Dr. Robertson, his sister's husband, were in the room with him. His sister was in an adjoining room. Dr. Robertson says that he did not promise to carry out the expressed wishes of the deceased. But it needs but the suggestion

to show that if he had made the promise, it could not bind his wife. In order to put the trust upon her she must have been an active agent in preventing a will. The husband cannot appropriate or encumber his wife's present property without her consent in writing. [Sec. 4340, R. S. 1899; Jones v. Elkins, 143 Mo. 647; Alkire Co. v. Ballinger, 137 Mo. 369.] How absurd then would it be to say that he could fasten a trust upon her property in expectancy.

But a part of the object in showing her husband made the promise was to connect it with her, she, as plaintiffs claim, having heard it made from her position in the adjoining room. Considering all the evidence on the subject of a promise, we, as already intimated, find it short of the certainty we have stated the law requires. She testified that she heard deceased stating over what he wished done with his property, but did not hear anything said by her husband in the nature of a promise, or otherwise. She did not hear anything of a promise by any one. The physician was uncertain whether any promise was exacted, and the pastor did not remember that there was.

But considering the case with the most liberal intendment for plaintiffs, it still falls short, and we say this having in mind the law we have already stated, that a promise may be implied from silence. Where was there any silent promise on her part? A promise, whether express or silent, especially of the nature here required, implies a conscious agency of commission or omission in the promisor. She was not present when the deceased expressed his desire and *he* did not know she was in hearing. He was therefore not taking her into consideration so far as his power to dispose of the property in that informal way was concerned. By thus acting he disclosed that he thought it was not necessary to effectuate a disposition of his property in that way that she should acquiesce in it so as to fasten a trust

upon her.  He did not require or ask her consent, by implication or otherwise, to become a trustee to dispose of his property as indicated by him.  He evidently did not suppose the property he desired for the others would go to her for disposition as directed.  He manifestly thought it would become the property of those he directed should have it, without action on her part.

But conceding, as we must, that she, although he did not know it, did in fact hear his directions as to the disposition of his property, and did not hear any objection from those to whom he gave the directions—should she have come in, or when she afterwards did come in, should she have objected, or else be held to have consented thereto?  To say she should, would imply that she knew she had a right to an agency in the matter, that she knew she had a right to interfere, or to reject the trust. And thus we would be assuming that she had more knowledge on the subject than he.  The manifest truth is that neither of them knew that it was necessary for her to have any part in it, and therefore she was not asked to have, and she did not consent, by silence or otherwise.  She is not chargeable with any more part in his failure to dispose of his property than an heir would be who knew of the provisions of a will which, after the testator's death, failed for lack of compliance with the law.   In the light of the evidence it would be both unreasonable and unjust to say that defendant caused her brother not to make a will.

There was some other evidence in the cause, from other witnesses, tending to show that defendant admitted her brother's directions and that she had promised to carry them out.  She denies such admissions and we find that we are asked to determine a case of this nature upon a mere preponderance of evidence, which we cannot do, unless it be of such nature, or the circumstances are such, as to lend to  the  preponderance a weight which is at once so persuasive, so cogent and cer-

tain as to leave no room for reasonable doubt. It has not met that requirement.

The result is that we approve the view taken by the trial court and hence affirm the judgment. All concur.